# United States Court of Appeals
## For the First Circuit

Nos. 12-2035
     12-2037
     12-2041

UNITED STATES OF AMERICA,

Appellee,

v.

JOSUÉ ALEJANDRO-MONTAÑEZ, JULIO SEVERINO-BATISTA,
and EDDIE ALEJANDRO-MONTAÑEZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Kayatta, Circuit Judges.

David A.F. Lewis for appellant Josué Alejandro-Montañez.
Leslie W. O'Brien for appellant Julio Severino-Batista.
Joshua L. Gordon for appellant Eddie Alejandro-Montañez.
Carlos R. Cardona, Assistant United States Attorney, with whom
Francisco A. Besosa-Martínez, Assistant United States Attorney,
Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson
Pérez-Sosa, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

February 18, 2015

**KAYATTA, Circuit Judge**.  Criminal defendants Josué Alejandro-Montañez, Julio Severino-Batista, and Eddie Alejandro-Montañez ("Defendants") appeal from convictions and sentences related to a criminal conspiracy to import cocaine.  Defendants argue that the district court: (1) erred in denying their motions for judgment of acquittal; (2) erred in determining cocaine quantity at sentencing; (3) abused its discretion in fashioning their sentences; (4) violated their Sixth Amendment right to a public trial; and (5) erred in applying a two-level sentencing enhancement for the foreseeable presence of a firearm.  We reject each of Defendants' arguments.  Nevertheless, in light of newly promulgated Amendment 782 to the United States Sentencing Guidelines, we accept the parties' joint request that we remand for reconsideration of the sentences.

## I.  Background

Along with four other co-conspirators, Defendants were indicted and convicted for a conspiracy that spanned from June 2008 to March 2009.  In considering a challenge to the sufficiency of the evidence supporting a guilty verdict, we recount "the facts in the light most favorable to the verdict."  United States v. Adorno-Molina, 774 F.3d 116, 119 (1st Cir. 2014).

## A. The Charged Conspiracy

In June 2008, the Drug Enforcement Agency ("DEA") paid a confidential informant ("CI")[1] to lure large-scale, Puerto Rican drug traffickers into a sham drug-purchasing scheme. Their target was Raúl Feliciano-López ("Fora").

CI first met Fora on June 20, 2008, at a restaurant in Isla Verde, Puerto Rico. CI proposed an ambitious deal to import 1000 kilograms of cocaine, via commercial air carrier, from Colombia to Puerto Rico, and from Puerto Rico on to Miami. Fora responded that he could receive, store, and distribute drugs, as well as provide related services. On June 26, at a restaurant in Puerto Nueveo, Fora introduced CI to a crooked cop named Victor Esquilin-Rosa, who could provide security. On August 28, again in Puerto Nueveo, Fora introduced CI to an unidentified person who knew people who could transport the cocaine by sea. This August 28 introduction was the last conspiratorial activity for a six-month period, during which CI was in Colombia.

On February 24, 2009, CI reinitiated contact with Fora and Esquilin, letting them know that he had returned to Puerto Rico. CI scaled back the shipment amount to 200 kilograms. A series of recorded phone calls took place between CI, Fora, and others, with

---

[1] We identify the informant as CI "in light of concerns about the safety of cooperating witnesses raised by the Committee on Court Administration and Case Management of the Judicial Conference of the United States." United States v. Etienne, 772 F.3d 907, 910 n.1 (1st Cir. 2014).

at least one involving defendant Julio Severino. On February 25, CI, Fora, Esquilin, and Severino met where CI and Fora had first met at a restaurant in Isla Verde. CI stated that he now expected a 500-kilogram cocaine shipment, and asked if he could count on them for "everything" including "security [and] firearms." Fora responded, "yes."

On March 4, CI, Fora, and Severino met at another restaurant in Isla Verde to discuss particulars, specifically, where and how to receive the cocaine. The plan was to transport and receive the cocaine by sea rather than by a commercial air carrier, as originally discussed. The following day, the same three men met at a parking lot and then drove to a beach in the Dorado area of Puerto Rico, scouting spots to unload the drugs. On March 10, they scouted locations near El Corcho Beach in Humacao. The defendants Alejandro brothers were supposed to join this second scouting expedition, but did not arrive in time. Later that day, the Alejandro brothers met CI,[2] and spoke about their roles in assisting the drug delivery. The brothers suggested a different beach on which to receive the drugs, and Eddie gave CI his telephone number.

On March 12, CI called Eddie to verify if "everything [was] ready." The next day, Fora called CI and said that Josué informed him that weather conditions were poor. On March 14, Fora called CI and said that they were ready. On March 15, CI called

---

[2] Fora and Severino were also at this meeting.

Fora and Eddie, telling them that the drugs would be delivered later that night.

In the early morning on March 16, the drug deal took place at a pier in Peñuelas. CI met Fora, Severino, and the Alejandro brothers. CI told them that the current shipment would be 300 kilograms of cocaine. CI observed Eddie carrying a firearm. To receive the shipment, the conspirators brought in total four vehicles, including the Alejandro brothers' SUV, which Eddie drove. A vessel, manned by DEA agents, pulled up to the pier with four sacks of sham cocaine. Severino and Josué Alejandro walked out to the pier to retrieve the sacks of sham cocaine. Eddie Alejandro waited by his SUV. DEA and Puerto Rico police then swooped in and made arrests. Police seized a pistol from Eddie's person. Police later searched the Alejandro brothers' SUV, finding two handguns and a rifle.

## B. Trial and Sentencing

Fora and Esquilin pled guilty and were sentenced to 150 and 144 months, respectively. Josué Alejandro, Julio Severino, and Eddie Alejandro went to trial and were found guilty.

The court sentenced Severino first. In calculating Severino's Sentencing Guidelines range, the district court held him accountable for 200 kilograms of cocaine, which, at that time, yielded a base offense level of 38. U.S. Sentencing Guidelines Manual § 2D1.1(a)(1) (2011). Under United States Sentencing

Guidelines section 2D1.1(b)(1), he was subject to a two-level increase for the foreseeable presence of a firearm during the offense. His Guidelines sentencing range was 292–365 months. In crafting a below-Guidelines 192-month sentence, the district court noted Severino's lack of criminal history, the fact that he did not personally carry a weapon, and his age (53 years).

The court then sentenced Josué and Eddie Alejandro. In applying the Sentencing Guidelines, the district court also held Josué and Eddie Alejandro accountable for 200 kilograms of cocaine, which, at that time, yielded a base offense level of 38. Id. § 2D1.1(c)(1). At the same time, after observing that CI controlled the actual amount of ersatz drugs involved, the district court assigned them the base offense level (36) applicable for 50 to 150 kilograms of cocaine. Under United States Sentencing Guidelines section 2D1.1(b)(1), they were also subject to a two-level increase for the foreseeable presence of a firearm during the offense. The resulting Sentencing Guidelines range for both brothers was 235–293 months. The district court sentenced each to 240 months in prison.

## II. Analysis

### A. The Sufficiency of the Evidence

Defendants argue that the district court erred in denying their motions for judgment of acquittal. We review the denial of such motions de novo. United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010). All reasonable inferences are drawn in favor of

the prosecution.  Id.  "If a reasonable jury could find the defendants guilty beyond a reasonable doubt of all elements of the charged offense, we must affirm the conviction."  Id.  Testimony from even just "one witness can support a conviction."  United States v. De La Paz-Rentas, 613 F.3d 18, 25 (1st Cir. 2010); see also United States v. Torres-Galindo, 206 F.3d 136, 139–40 (1st Cir. 2000) (noting that "uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible").

Here, Defendants challenge (1) the sufficiency of the evidence to convict them of any conspiracy, and (2) the sufficiency of the evidence to convict them of the indictment's overarching conspiracy.  After quickly disposing of their first challenge, we give some attention to their second before concluding, similarly, that the evidence was more than sufficient.

**1.  Sufficiency of the evidence to convict Defendants of any conspiracy.**

"To sustain a conspiracy conviction, the government must show that the defendant knowingly agreed with at least one other person to commit a crime, intending that the underlying offense be completed." United States v. Ledee, 772 F.3d 21, 32 (1st Cir. 2014). "The agreement need not . . . be express, [and] may consist of no more than a tacit understanding." United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011) (internal quotation marks omitted).

Here, the record is replete with evidence that Defendants knowingly agreed to import and distribute a shipment of cocaine that involved more than five kilograms, as charged in the indictment.[3] At trial, the government introduced recorded phone calls during which the Defendants planned logistics. CI also recorded in-person meetings with Defendants, discussing cocaine amounts in the hundreds of kilograms. Moreover, police arrested Defendants while they were actually in the process of unloading four sacks of fake cocaine, in the middle of the night, with four cars, and multiple weapons. CI testified at trial and relayed all of this first-hand information to the jury. In short, the evidence virtually compelled a finding that Defendants conspired to import and possess five kilograms or more of cocaine.

### 2. Sufficiency of the evidence to convict Defendants of the indictment's overarching conspiracy.

We turn to the Defendants' fall-back argument, that the evidence was insufficient to convict them of the specific overarching June 2008–March 2009 conspiracy charged in the indictment.

Defendants argue that the evidence at trial showed at least two conspiracies: a June–August 2008 conspiracy to import larger amounts of cocaine from Colombia to Miami, and a separate

---

[3] The fact that the cocaine was, unbeknownst to Defendants, fake, offers them no escape hatch. See, e.g., Dellosantos, 649 F.3d at 115 ("The agreement is the *sine qua non* of a conspiracy.").

February-March 2009 conspiracy to import smaller amounts of cocaine, with no Miami distribution plans. Defendants argue that the six-month lull between the 2008 conspiratorial activities and the 2009 conspiratorial activities prevents a reasonable jury from finding them guilty beyond a reasonable doubt of the charged conspiracy. Defendants joined the conspiracy after the six-month lull and thus, their argument runs, they cannot be convicted of a conspiracy including the events of June-August 2008.

Whether the evidence evinces one or multiple conspiracies "is a question of fact for the jury and is reviewed only for the sufficiency of the evidence." United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009). With the jury properly instructed, as here,[4] on the need to determine whether the defendants were guilty of the charged conspiracy, the guilty verdict "can be seen as an effective rejection of the multiple conspiracy theory." United States v. Wihbey, 75 F.3d 761, 775 n.8 (1st Cir. 1996) (citing United States v. Sepulveda, 15 F.3d 1161, 1191 (1st Cir. 1993)). While there may be conflicting inferences, as long as the evidence is adequate to permit a reasonable trier of fact to find a single conspiracy beyond a reasonable doubt, "the jury's finding will not be disturbed on appeal." United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009).

---

[4] Defendants do not challenge the jury instructions.

When evaluating whether the evidence can support the existence of a single conspiracy, "we ultimately look to the totality of the evidence." Id. We "pay[] particular heed to factors such as the existence of a common goal, evidence of interdependence among the participants, and the degree to which their roles overlap." Niemi, 579 F.3d at 127 (quoting United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004)).

Looking at the totality of the evidence, a reasonable jury, drawing inferences from the record, could find beyond a reasonable doubt the "common goal," "interdependence," and "overlap" factors satisfied here. Specifically, the jury could find that the conspirators maintained the common goal of importing large quantities of cocaine from Colombia into Puerto Rico for profit; that each conspirator's role was individually necessary for the success of the overall conspiracy; and that Fora was the conspiracy's leader throughout its lifetime, satisfying the overlap factor, see United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (noting that "[t]he overlap requirement can be satisfied by the pervasive involvement of a single core conspirator") (internal quotation marks omitted).

The common goal factor is given a "wide breadth." United States v. Sanchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008); see also Portela, 167 F.3d at 695 (finding common goal factor satisfied by each defendant's "interest in furthering the distribution of

cocaine"). Here, Defendants attempt to carve one conspiracy into two, based on differences between the 2008 and 2009 plans, plus the six-month hiatus. In 2008, the plan involved using a commercial air carrier to bring larger amounts of cocaine from Colombia to Puerto Rico, and ultimately on to Miami. In 2009, the plan involved maritime transportation, a smaller cocaine quantity, and no Miami distribution plans. That the plan changed does not prevent the jury from finding one conspiracy existed. Here, too, the last meeting before the lull foreshadowed the move to a maritime conveyance. The conspirators maintained a broader unitary goal of importing cocaine across the 2008 and 2009 time frames. That constant objective satisfies the common goal factor. See Portela, 167 F.3d at 695.

Interdependence among the conspirators "requires determining whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Id. (internal quotation marks omitted). "[E]vidence of another individual participant's understanding of the interdependence of the co-conspirators' activities is evidence-- often the best evidence--of tacit agreement between the individual and his co-conspirators." Id. Here, Defendants note that none of them was involved in 2008. While true, that does not diminish the interdependence that ultimately existed between them and the other conspirators. Each conspirator played a necessary role in the conspiracy. Fora was the organizer who connected Esquilin and

-11-

Defendants to CI.  While Defendants joined at the eleventh hour, their roles were no less important for it.  Defendants provided security, firearms, and vehicles--necessary support to ensure safe transportation of the drugs.  That Defendants joined late and were not involved in the early planning stages does not prevent the jury from finding a single conspiracy on this record.  See id. at 696 ("The fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." (internal quotation marks omitted)).  It would be perfectly reasonable for a jury to find a single, continuing plan, starting in June 2008 and coming into fruition in March 2009.  The June 2008 preliminary planning meetings gave rise to the February–March 2009 events.  The evidence here was "adequate to permit a reasonable trier of fact to have found a single conspiracy beyond a reasonable doubt."  Manqual-Santiago, 562 F.3d at 421.  As such, "the jury's finding will not be disturbed."  Id.

Additionally, even accepting Defendants' contention that the evidence shows two separate conspiracies, it would make no difference to the outcome here.  At worst, we would have a nonprejudicial variance between the charged crime and the evidence adduced at trial.  See id. ("[A] variance is grounds for reversal only if it is prejudicial.").

Here, all of the drugs, indeed all sentencing factors, attributed to Defendants arose from the latter part of the conspiracy.  Had they only been charged with that part, they would be in exactly the same position.  And the overwhelming evidence against them eliminates any plausible concern that evidence pertinent only to the earlier stages of the conspiracy might have prejudicially distracted the defense effort or in any other way tipped the balance against Defendants.

## B. Cocaine Quantity Instructions

Defendants argue that the district court committed error under Alleyne v. United States, 133 S. Ct. 2151 (2013), because the jury allegedly did not find the amount of cocaine attributable to each defendant (an element of the offense) beyond a reasonable doubt.[5]  The district court, however, specifically instructed the jurors for both the possession and importation counts that they needed to find, beyond a reasonable doubt, that the agreement specified in the indictment "existed between at least two people to [possess/import] with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine; and . . . that the defendant willfully joined in that agreement."  Finally, the district court had jury verdict forms for each individual defendant on which the jurors specifically found

---

[5]  Five kilograms of cocaine is the threshold for the most aggravated form of drug distribution, and carries a mandatory minimum of 10 years. 21 U.S.C. §§ 841(b)(1)(A), 960(b)(1)(B).

that the amount of cocaine involved in the offense was more than five kilograms.

Defendants also argue that the district court should have instructed the jury on the lesser included (i.e., lower amount) offenses under 21 U.S.C. § 841(b)(1)(B),(c). But they never asked for such an instruction, cite no authority for why it was nevertheless required, and, in any event, cannot establish plain error prejudice given the overwhelming evidence of a quantity in excess of five kilograms. See United States v. Dominguez Benitez, 542 U.S. 74, 81 (2004) (plain error must have "a prejudicial effect on the outcome of a judicial proceeding").

## C. Sentencing Disparities

Defendants next argue that the disparity between Defendants' sentences and those of similarly-situated co-defendants manifests an unreasonable application of 18 U.S.C. § 3553(a)(6),[6] which requires the district court to "consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." They claim that the district court did not explain how the least culpable conspirators ended up with the harshest sentences. But the district court did supply a sufficient reason for the disparity between

---

[6] Presumably because his sentence was four years shorter than those given to the Alejandro brothers, Severino does not argue that the court erred in failing to reduce his base offense level as it reduced the levels for the Alejandro brothers.

Defendants and other conspirators: namely, the other conspirators pled guilty before trial.[7] See United States v. Vaszquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006) ("Although a district court may consider disparities among co-defendants in determining a sentence, we do not find [a defendant's] sentence to be unreasonable simply because his co-defendants agreed to help the government in exchange for reduced sentences."); see also United States v. Yeje-Cabrera, 430 F.3d 1, 26-27 (1st Cir. 2005) ("[A] defendant simply has no right to a sentence, after trial, that is as lenient as a sentence he could have had earlier in a plea bargain.").

**D. Public Trial Right**

In his brief to this court, Josué Alejandro argues for the first time that the district court excluded Defendants' family members from the courtroom during jury selection.[8] Because Defendants did not object at trial, we review only for plain error. See United States v. Colon, 744 F.3d 752, 757 (1st Cir. 2014). Here, Defendants trip at the first hurdle of plain error review. The record fails to support their claim that the courtroom was ever closed, during voir dire or at any other time.

---

[7] The district court considered additional factors, including that Eddie Alejandro provided weapons and transportation.

[8] Julio Severino and Eddie Alejandro subsequently incorporated this argument into their briefs.

**E. Two-level Firearm Sentencing Enhancement**

Defendants were each subject to a two-level enhancement under United States Sentencing Guidelines section 2D1.1(b)(1) for the foreseeable presence of a firearm during the drug offense. "That guideline applies if a dangerous weapon was possessed during the course of a drug-trafficking offense, provided that the presence of the weapon was known to, or reasonably foreseeable to, the defendant." United States v. Fermin, 771 F.3d 71, 82 (1st Cir. 2014) (citing United States v. Quiñones-Medina, 553 F.3d 19, 23 (1st Cir. 2009)). The Alejandro brothers were acquitted of a firearm charge, but were still subject to the two-level enhancement. Severino was not charged with the firearm violation, but was also ultimately subject to the enhancement. Defendants acknowledge the state of the law on this issue, but seek to preserve their claim for Supreme Court review. We review the district court's Sentencing Guidelines interpretation de novo and its factual findings for clear error. United States v. Ortiz-Torres, 449 F.3d 61, 77 (1st Cir. 2006).

As the law now plainly stands, "acquitted conduct, if proved by a preponderance of the evidence, . . . may form the basis for a sentencing enhancement." United States v. Gobbi, 471 F.3d 302, 314 (1st Cir. 2006). The district court's factual findings were not clearly erroneous. Eddie and Josué Alejandro brought a vehicle to the pier that had three weapons hidden in a secret compartment. Eddie was arrested with a firearm on his person.

Severino similarly was with these other men throughout planning meetings, on the night of the drug deal, and was hired in part to provide additional security. With this record, the district court did not clearly err in finding that Severino also foresaw that a firearm would be present in the course of the offense.

**F.  Recent Amendments to the Federal Sentencing Guidelines**

Defendants filed a supplemental brief seeking to reduce their sentences based on Amendment 782 to the Sentencing Guidelines, which became effective on November 1, 2014, and retroactively reduced most drug quantity base offense levels by two levels. See U.S. Sentencing Guidelines Manual. app. C. After oral argument, the government replied, conceding that this court should remand to determine whether to reduce Defendants' sentences.

District courts "may" reduce prison terms if the defendant's sentence was "based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(2). The Sentencing Commission permits a sentence reduction under section 3582(c)(2) if an amendment, declared retroactive, lowers a defendant's applicable Guidelines range. U.S. Sentencing Guidelines Manual § 1B1.10(a)(1). The Sentencing Commission expressly made

Amendment 782 retroactive, effective as of November 1, 2015.[9] See id. § 1B1.10(d), (e)(1) (2014). When considering a sentence reduction, the district court "shall substitute the amended Guidelines range for the initial range and shall leave all other guideline application decisions unaffected." Dillon v. United States, 560 U.S. 817, 831 (2010) (quoting U.S. Sentencing Guidelines Manual § 1B1.10(b)(1)).

Defendants' sentences were based on a sentencing range now reduced by Amendment 782. We therefore grant Defendants' unopposed request that we remand their cases back to the district court for a determination of whether and to what extent a sentencing reduction is warranted for that reason.

### III. Conclusion

For the foregoing reasons the judgment of the district court is affirmed. These cases are nevertheless remanded to the district court so that it may consider a sentencing reduction in accord with Amendment 782.

So ordered.

**- Concurring Opinion Follows -**

---

[9] Amendment 782 became immediately effective for defendants sentenced on or after November 1, 2014. For defendants who were sentenced prior to the effective date, like the Alejandro brothers, Amendment 782 does not have retroactive effect until November 2015. U.S. Sentencing Guidelines Manual § 1B1.10(e)(1) (2014). A district court may accept motions for retroactive application prior to November 1, 2015, provided that any potential sentencing reduction not take effect until November 2015. Id. § 1B1.10 cmt. n.6.

**TORRUELLA, <u>Circuit Judge</u> (Concurring).** I join the court's opinion but write separately to note my continued disagreement with the current state of the law regarding certain sentencing enhancements. As I have stated previously, <u>see</u> <u>generally</u> <u>United States</u> v. <u>St. Hill</u>, 768 F.3d 33 (1st Cir. 2014) (Torruella, J., concurring), and thus will not rehash in detail here, I believe it is inappropriate and constitutionally suspect to enhance a defendant's sentence based on conduct that the defendant was either (in the case of Severino) not charged with or (in the case of the Alejandro brothers) acquitted of. The two-level "gun-bump" enhancement falls squarely into this category.